### RIVENBURGH v. FIRST NAT. BANK OF MIDDLEBURGH.

(Supreme Court, Appellate Division, Third Department. March 8, 1905.)

Dissenting opinion. For majority opinion, see 92 N. Y. Supp. 652.

PARKER, P. J. (dissenting). I dissent from the conclusion to which the court has arrived in this case, and I state the facts at length, for the reason that I cannot discover in the record before us any such as are given in the opinion of the court:

John D. King some time in the fall of 1903 went to live with his friend Frederick Rivenburgh, this plaintiff. It does not appear that there was any agreement as to the terms upon which he was to live there. He was an old and feeble man, and seems to have gone there in the first instance as a visitor. He remained there more or less until the next spring, and on the 20th day of March, 1904, he died there. At the time he went to the plaintiff's, and on March 5th thereafter, he was the owner of and held two certificates of deposit issued by the defending bank—one for $100, dated January 25, 1901, and the other for $30, dated March 30, 1903. The following is a copy of the $100 certificate, viz.:

"[Two-cent revenue stamp, canceled.]
"No. 17532. The First National Bank, Middleburgh, N. Y., Jan. 25, 1901. John D. King has deposited in this Bank, one hundred dollars payable to the order of himself on return of this certificate properly endorsed. Interest at 3 per cent. per annum for even months if not drawn for six months. Interest ceases after 18 months. Demand certificate of deposit. Not subject to check.
"$100.00.                                                    M. L. Tator, Cashier."

The $30 certificate was similar to that, except as to the amount, the number, and the revenue stamp.

King was sick at the plaintiff's some three or four weeks before he died, and the plaintiff and his wife during that time cared for and nursed him. The plaintiff also got a doctor for him once, and, during all the time that he was with plaintiff that winter, seems to have furnished him board and lodging in his family. He also, at King's death, "looked after his burial." It seems to be not disputed but that all the care, board, burial, etc., which the plaintiff furnished to King, was fairly worth $200. Between $5 and $6 only was paid by King to plaintiff. On March 5th, King, being then ill, asked the plaintiff to go and get some one to come and draw a paper for him. The plaintiff went and procured Mr. Safford, a neighboring farmer, to come for that purpose. When Safford went to King, he asked what he wanted; and King replied that "he wanted something drawn up to give Mr. Rivenburgh

what he had, for taking care of him and burying him." Safford thereupon drew up a paper, of which the following is a copy, and read it over to King, who said it was all right, and signed it by making his mark thereto, and plaintiff and his wife thereupon made their marks thereto as witnesses, viz.:

"Gilboa, March 5, 1904.
    "In the year of Our Lord, Nineteen Hundred and Four, I, John D. King, do give all my property, goods and chattels, with one hundred and thirty dollars in the Middleburgh Bank, for taking care of me through my sickness, all to Frederick Rivenburgh, but said King hold the property long as he lives.

                                                              his
    "Witnesses:                                    "John  X  D. King.
                                                            mark.
         her
    "Lany  X  Rivenburgh.
         mark.
              his
    "Frederick  X  Rivenburgh."
              mark.

After King had executed the paper, he gave it to Safford and requested him to hold it, and, if he (King) died, to deliver it to the plaintiff, but, if King got well, not to deliver it to the plaintiff, but to deliver it to King himself. Safford thereupon took the paper home, and kept it until King's death, which occurred some two weeks later, and then delivered it to the plaintiff, as King had directed. The plaintiff thereupon looked over King's papers, and found the two certificates among them. He took possession of them, and, claiming to be the owner of them as King's assignee, indorsed each one of them as follows: "John D. King by Frederick Rivenburgh. Assignee, Frederick Rivenburgh"—and, presenting the same to the said bank, demanded payment thereof. Such bank refused payment thereof, and subsequently this action was brought by the plaintiff individually to recover upon the said certificates, as the owner and holder thereof. It does not appear that any executor or administrator has ever been appointed for said King's estate.

Upon the trial of this action, after the plaintiff had rested his case, the court, on defendant's motion, dismissed the complaint, with costs, and from the judgment entered thereon this appeal is taken.

The plaintiff seeks to recover against the bank the amount of the certificates in question, upon the theory that John D. King transferred to him the ownership thereof by the writing of March 5, 1904, which Safford drew up, and delivered to the plaintiff after King's death. That writing does not mention such certificates, and it is not claimed that its execution amounted to an indorsement of them over to the plaintiff. The claim is that the phrase, "all my property, goods and chattels, with one hundred and thirty dollars in the Middleburgh Bank," includes the certificates, and that, being choses in action, they pass by the assignment or transfer contained in such instrument.

Assuming that such a certificate may be transferred, as an ordinary chose in action, without indorsement, so as to vest a right of

action thereon in the transferee, I am of the opinion that no assignment or transfer of King's property was either intended or perfected by the instrument in question. It must be noticed that the execution of such paper was not the result of any contract between the plaintiff and King. The plaintiff was not claiming that King then owed him anything. He did not then ask for payment or security for a debt, nor did he agree, upon the execution of that paper, to accept it in discharge of any debt, or to perform any further services in consideration thereof. He does not now testify that any bargain whatever concerning King's property was then made or had been previously made, which was intended to be put into writing by the paper in question. King's purpose, therefore, seems to have been simply this: He wished that all his property should be applied towards paying for his care and support so long as he did live, but, being then ill and apprehensive that he might not recover, he desired Rivenburgh should in that event have it all, provided he continued to care for him through to the end of such sickness. Hence he at once sent for some one who could draw up a paper that should express that desire, and evidently both he and Safford considered that the paper in question did express it. But to make it clear that King did not intend that all his property was to be at once transferred from himself to Rivenburgh, he left the paper with Safford, and forbade its delivery until after his death. The purpose to retain the ownership of his property to himself so long as he lived is evidenced not only by the provision in the writing itself to that effect, but also by the further direction that the writing was to remain undelivered and have no effect whatever until after his death. The whole transaction was a voluntary act on King's part—one not carried out in pursuance of any contract or arrangement with Rivenburgh, but simply inspired by his own wish, and being altogether in the nature of a voluntary disposition of his property after his death. It is a significant fact that the paper assumes to transfer all of King's property. And it is exceedingly clear that King did not desire it to become effective until after his death. Under such an instrument, and under such circumstances, the title of King's property was not transferred to Rivenburgh. There was no present transfer whatever. There was an attempt to make a testamentary disposition of his property to Rivenburgh, but it utterly lacks the formalities and provisions which the law requires to make it effective as a will, and hence it was utterly insufficient to pass any title whatever. Rivenburgh did not through it acquire any ownership to the certificates, and so King died the owner of them, and no one but his administrator can recover upon them.

The judgment is correct, and should be affirmed, with costs.